No. 25-3303

IN THE
# United States Court of Appeals for the Eighth Circuit

EYIOMA UWAZURIKE, *et al.*,

*Plaintiffs-Appellants*,

v.

DAVE JOBES, *et al.*,

*Defendants-Appellees*,

On Appeal from the United States District Court
for the Southern District of Iowa
Case No. 4:24-cv-00146-RGE
(The Honorable Rebecca Goodgame Ebinger)

**BRIEF OF DEFENDANTS-APPELLEES**


BRENNA BIRD
Attorney General of Iowa

ERIC WESSAN
*Solicitor General*

PATRICK C. VALENCIA
*Deputy Solicitor General*

June 1, 2026

HALLE B. KISSELL
*Assistant Solicitor General*

Hoover State Office Building
1305 East Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
halle.kissell@ag.iowa.gov

*Counsel for Defendants-Appellees*

## SUMMARY OF CASE AND STATEMENT ON ORAL ARGUMENT

This appeal concerns qualified immunity and the absence of clearly established law in the context of regulated online sports wagering, geolocation-based enforcement, and the Fourth Amendment. Plaintiffs/Intervenors, former Iowa college athletes, brought Section 1983 claims against Defendants, state law enforcement officers, alleging Fourth Amendment violations after Defendants reviewed sportsbook geolocation data, under Iowa's sports wagering framework—data that all users voluntarily turn over to third parties as a condition of use. *See* Iowa Code § 99F.12(2)(*b*); 491 Iowa Admin. Code r. 13.5(3)(*b*).

The district court granted Defendants' motions to dismiss, concluding Defendants were entitled to qualified immunity because Plaintiffs/Intervenors failed to identify any controlling authority clearly establishing that reviewing geolocation data obtained from regulated third parties, or relying on that data to obtain subpoenas and warrants, violates the Fourth Amendment. On appeal, Plaintiffs still rely on generalized principles and factually distinguishable cases. Because Plaintiffs fail to establish either a clearly established right or an underlying constitutional violation, this Court should affirm.

Defendants request 15 minutes per side for oral argument.

## TABLE OF CONTENTS

**Page**

SUMMARY OF CASE AND STATEMENT ON ORAL ARGUMENT ........ i

TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ iv

STATEMENT OF JURISDICTION ........ 1

STATEMENT OF THE ISSUES FOR REVIEW ........ 1

INTRODUCTION ........ 3

STATEMENT OF THE CASE ........ 5

A. Iowa Legalizes and Regulates Sports Wagering. ........ 5

B. Comprehensive Regulatory Scheme and Monitoring Requirements. ........ 7

C. Plaintiffs'/Intervenors' Conduct and Resulting Investigation. ........ 10

D. Suspensions, Criminal Proceedings, and Alleged Damages ........ 12

E. Plaintiffs/Intervenors Sue and Defendants Move to Dismiss. ........ 13

F. District Court Grants Motion to Dismiss. ........ 15

SUMMARY OF THE ARGUMENT ........ 19

ARGUMENT ........ 21

I. Standard of Review. ........ 21

II. The District Court Correctly Dismissed the Complaint Because Defendants are Entitled to Qualified Immunity. ........ 21

**TABLE OF CONTENTS—Continued**


**Page**

A. Qualified immunity as to searches. ..... 23

B. Qualified immunity as to subpoenas. ..... 44

C. Qualified immunity as to warrants and seizures. ..... 46

D. Qualified immunity as to failure-to-intervene claim. ..... 49

III. Defendants Are Entitled to Qualified Immunity Because Plaintiffs/Intervenors Failed to Plead a Plausible Constitutional Violation. ..... 52

A. Several Plaintiffs/Intervenors lack Fourth Amendment standing to challenge searches of a third-party's gambling account. ..... 52

B. Plaintiffs/Intervenors failed to plead a constitutional violation as to a Fourth Amendment search. ..... 58

C. No unconstitutional seizure or derivative Fourth Amendment violation occurred. ..... 67

CONCLUSION ..... 74

CERTIFICATE OF COMPLIANCE ..... 75

CERTIFICATE OF SERVICE ..... 76

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**


*Alderman v. United States*,
394 U.S. 165 (1969) .......... 52

*Anderson v. Creighton*,
483 U.S. 635 (1987) .......... 30, 36

*Andrews v. Schafer*,
888 F.3d 981 (8th Cir. 2018) .......... 49

*Arizona v. Hicks*,
480 U.S. 321 (1987) .......... 69

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011) .......... *passim*

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 20, 21

*Byrd v. United States*,
584 U.S. 395 (2018) .......... 55

*Carpenter v. United States*,
585 U.S. 296 (2018) .......... *passim*

*Dalia v. United States*,
441 U.S. 238 (1979) .......... 70, 72

*Davis v. City of Little Rock*,
122 F.4th 326 (8th Cir. 2024) .......... 71

*Dean v. Searcey*,
893 F.3d 504 (8th Cir. 2018) .......... 4

*District of Columbia v. Wesby*,
583 U.S. 48 (2018) .......... *passim*

*Franks v. Delaware*,
438 U.S. 154 (1978) .......... 70, 71

*Grossman v. City of Portland*,
33 F.3d 1200 (9th Cir. 1994) .......... 31

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982) .......... 22

*Harper v. Werfel*,
118 F.4th 100 (1st Cir. 2024) .......... 65

*Hess v. Ables*,
714 F.3d 1048 (8th Cir. 2013) .......... 49

Page(s)

*Hope v. Pelzer*,
536 U.S. 730 (2002) .......... 35
*Howard v. Kan. City Police Dept.*,
570 F.3d 984 (8th Cir. 2009) .......... 29
*Hunt v. Hopkins*,
266 F.3d 934 (8th Cir. 2001) .......... 1
*Katz v. United States*,
389 U.S. 347 (1967) .......... 58
*Kelsay v. Ernst*,
933 F.3d 975 (8th Cir. 2019) .......... 22, 23, 34
*Kyllo v. United States*,
533 U.S. 27 (2001) .......... 37, 39
*Lane v. Peterson*,
899 F.2d 737 (8th Cir. 1990) .......... 51
*Lombardo v. City of St. Louis*,
38 F.4th 684 (8th Cir. 2022) .......... 21, 22, 51
*Meehan v. Thompson*,
763 F.3d 936 (8th Cir. 2014) .......... 31
*Minnesota v. Carter*,
525 U.S. 83 (1998) .......... 52, 53
*Mitchell v. Forsyth*,
472 U.S. 511 (1985) .......... 44
*Mungai v. Univ. of Minn.*,
141 F.4th 959 (8th Cir. 2025) .......... 20
*Nance v. Sammis*,
586 F.3d 604 (8th Cir. 2009) .......... 49, 50
*N.J. Thoroughbred Horsemen's Ass'n v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (2018) .......... 5
*Patel v. Lanier County*,
969 F.3d 1173 (11th Cir. 2020) .......... 23, 24
*Pearson v. Callahan*,
555 U.S. 223 (2009) .......... 21, 42, 46
*Perkins v. City of Des Moines*,
712 F.Supp.3d 1159 (S.D. Iowa 2024) .......... 49, 50
*PPS, Inc. v. Faulkner Cnty., Ark.*,
630 F.3d 1098 (8th Cir. 2011) .......... 68, 69

**Page(s)**

*Procunier v. Navarette*,
434 U.S. 555 (1978) .......... 27
*Rakas v. Illinois*,
439 U.S. 128 (1978) .......... 52, 53, 55, 56
*Riley v. California*,
573 U.S. 373 (2014) .......... 37, 39
*Rivas-Villegas v. Cortesluna*,
595 U.S. 1 (2021) .......... 23
*Ryno v. City of Waynesville*,
58 F.4th 995 (8th Cir. 2023) .......... 23
*Sanchez v. L.A. Dep't of Transp.*,
39 F.4th 548 (9th Cir. 2022) .......... 63
*Saucier v. Katz*,
533 U.S. 194 (2001) .......... 21, 28, 29
*Smith v. Maryland*,
442 U.S. 735 (1979) .......... 30, 58, 60, 64
*Taylor v. Riojas*,
592 U.S. 7 (2020) .......... 33, 34
*Texas v. Brown*,
460 U.S. 730 (1983) .......... 68
*T.S.H. v. Green*,
996 F.3d 915 (8th Cir. 2021) .......... 24, 25, 37, 38
*United States v. Barragan*,
379 F.3d 524 (8th Cir. 2004) .......... 52, 53, 54, 55, 56
*United States v. Bettis*,
946 F.3d 1024 (8th Cir. 2020) .......... 55, 56
*United States v. Boruff*,
909 F.2d 111 (5th Cir. 1990) .......... 54
*United States v. Chatrie*,
590 F.Supp.3d 901 (E.D. Va. 2022) .......... 42
*United States v. Chatrie*,
107 F.4th 319 (4th Cir. 2024) .......... 33
*United States v. Chatrie*,
136 F.4th 100 (4th Cir. 2025) .......... 41
*United States v. Clutter*,
674 F.3d 980 (8th Cir. 2012) .......... 68

**Page(s)**

*United States v. Davis*,
2022 WL 3009240 (M.D. Ala. July 1, 2022) .................................. 26, 53
*United States v. Davis*,
785 F.3d 498 (11th Cir. 2015) ............................................................ 59
*United States v. Gomez*,
16 F.3d 254 (8th Cir. 1994) ................................................................ 53
*United States v. Gratkowski*,
964 F.3d 307 (5th Cir. 2020) .............................................................. 65
*United States v. Green*,
275 F.3d 694 (8th Cir. 2001) .............................................................. 54
*United States v. Jacobsen*,
466 U.S. 109 (1984) ...................................................................... 68, 69
*United States v. Jones*,
565 U.S. 400 (2012) ............................................................................ 64
*United States v. Kirkendoll*,
2024 WL 1016049 (D.N.M. Mar. 8, 2024) ........................................... 27
*United States v. Leon*,
468 U.S. 897 (1984) ...................................................................... 67, 68
*United States v. Madrid*,
152 F.3d 1034 (8th Cir. 1998) ........................................................ 47, 67
*United States v. Mangum*,
100 F.3d 164 (D.C. Cir. 1996) ............................................................ 54
*United States v. Miller*,
425 U.S. 435 (1976) ........................................................ 30, 58, 60, 64
*United States v. Muhammad*,
604 F.3d 1022 (8th Cir. 2010) ........................................................ 69, 70
*United States v. Pricop*,
775 F.Supp.3d 1036 (D. Ariz. 2025) ............................................. 32, 33
*United States v. Rhine*,
652 F.Supp.3d 38 (D.D.C. 2023) ......................................................... 26
*United States v. Risse*,
83 F.3d 212 (8th Cir. 1996) ................................................................ 55
*United States v. Roberts*,
881 F.3d 1049 (8th Cir. 2018) ................................... 34, 36, 45, 48, 72
*United States v. Saddler*,
19 F.4th 1035 (8th Cir. 2021) ............................................................. 67

**Page(s)**

*United States v. Sesay*,
937 F.3d 1146 (8th Cir. 2019) .......... 37, 39, 40
*United States v. Shipton*,
5 F.4th 933 (8th Cir. 2021) .......... 65
*United States v. Smith*,
110 F.4th 817 (5th Cir. 2024) .......... 32, 33
*United States v. Stevens*,
530 F.3d 714 (8th Cir. 2008) .......... 70
*United States v. Whispering Oaks Residential Care Facility, LLC*,
673 F.3d 813 (8th Cir. 2012) .......... 72
*Wendt v. Iowa*,
2019 WL 13241967 (S.D. Iowa Sept. 23, 2019) .......... 72
*Wong Sun v. United States*,
371 U.S. 471 (1963) .......... 47, 48
*Zorn v. Linton*,
146 S. Ct. 926 (2026) .......... 23, 38
*Zubrod v. Hoch*,
907 F.3d 568 (8th Cir. 2018) .......... 49, 50

**Statutes**

28 U.S.C. § 1331 .......... 1
Iowa Code § 99F.1(29) .......... 5
Iowa Code § 99F.3 .......... 5
Iowa Code § 99F.7 .......... 5
Iowa Code § 99F.7A(3) .......... 5
Iowa Code § 99F.7A(4) .......... 7
Iowa Code § 99F.9(4)(*a*)(1) .......... 5, 6
Iowa Code § 99F.9(4)(*a*)(3) .......... 6
Iowa Code § 99F.12(2)(*b*) .......... 3, 7, 30, 31, 32

**Rules**

Fed. R. App. P. 28(a)(8)(A) .......... 34, 45, 48, 72

**Regulations**

491 Iowa Admin. Code r. 13.1 .......... 5

Page(s)

491 Iowa Admin. Code r. 13.2(2) ........ 7
491 Iowa Admin. Code r. 13.2(7) ........ 6
491 Iowa Admin. Code r. 13.2(7)(*a*) ........ 7
491 Iowa Admin. Code r. 13.2(7)(*b*) ........ 7
491 Iowa Admin. Code r. 13.2(7)(*c*) ........ 7
491 Iowa Admin. Code r. 13.2(7)(*d*) ........ 7
491 Iowa Admin. Code r. 13.2(7)(*e*) ........ 7
491 Iowa Admin. Code r. 13.5(3) ........ 6
491 Iowa Admin. Code r. 13.5(3)(*b*) ........ 7, 30, 31, 32

**Other Authorities**

*Frequently Asked Questions*,
GeoComply, https://perma.cc/7UYS-D5VE ........ 8, 9

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 and issued its order granting Defendants' motion to dismiss on November 5, 2025. App. 929–62, R.Doc.89 at 1–34. Plaintiffs/Intervenors timely appealed on November 13. App. 966–68, R.Doc.91 at 1–3. This Court has jurisdiction under 28 U.S.C. § 1291 to review all final decisions of the United States district courts. *Hunt v. Hopkins*, 266 F.3d 934, 936 (8th Cir. 2001).

## STATEMENT OF THE ISSUES FOR REVIEW

1. Whether the district court correctly dismissed Plaintiffs'/Intervenors' Fourth Amendment claims because Defendants are entitled to qualified immunity where Plaintiffs/Intervenors failed to show the violation of any clearly established constitutional right.

**Cases**: *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)

*District of Columbia v. Wesby*, 583 U.S. 48 (2018)

*Pearson v. Callahan*, 555 U.S. 223 (2009)

**Statutes:** Iowa Code § 99F.12(2)(*b*)

42 U.S.C. § 1983

2. Whether Defendants are entitled to qualified immunity where Plaintiffs/Intervenors failed to plead a plausible Fourth Amendment violation, where some lacked Fourth Amendment standing, and where the alleged conduct rested on lawful access to third-party data and did not constitute an unconstitutional search or seizure.

**Cases**: *Carpenter v. United States*, 585 U.S. 296 (2018)

*Smith v. Maryland*, 442 U.S. 735 (1979)

*United States v. Miller*, 425 U.S. 435 (1976)

*United States v. Barragan*, 379 F.3d 524 (8th Cir. 2004)

## INTRODUCTION

In 2019, Iowa legalized online sports wagering, making smartphones and computers the gateway to placing bets. But Iowa law imposes territorial limits: bettors must be physically located in the State. To enforce those limits, sportsbooks are required by statute to monitor users' geolocation activity, reject wagers placed outside of Iowa, and report suspicious activity to the Iowa Racing and Gaming Commission.

To comply with those requirements, many sportsbooks rely on GeoComply, a licensed vendor in Iowa that provides geolocation technology and software tools to track and display anonymized location data. Sportsbooks disclose this monitoring to users through their user agreements, terms and conditions, and privacy policies, including explicitly providing that such data may be shared with third parties or law enforcement.

Plaintiffs/Intervenors—all former college athletes at Iowa institutions—used mobile sportsbooks to place wagers in violation of NCAA rules, and at times, Iowa law. In doing so, they voluntarily shared their location data so they could gamble online. Some even attempted to evade detection by fraudulently using others' sportsbook accounts.

Defendants are sworn law enforcement officers with the Iowa Division of Criminal Investigation ("DCI") Special Enforcement Operations Bureau, the State's primary agency for enforcing sports wagering laws. In September 2023, the Iowa Racing & Gaming Commission authorized DCI to review geolocation data for signs of suspicious or illegal wagering activity, including conduct suggesting match fixing or fraud. *See* Iowa Code § 99F.12(2)(*b*).

DCI agents identified wagering activity occurring within restricted college athletic facilities. These restricted facilities are utilized by individuals, such as athletes, who are prohibited from betting and have access to information that could potentially lead to match fixing. DCI then issued subpoenas to identify the users involved and later obtained search warrants for Plaintiffs'/Intervenors' phones. Following that investigation, Plaintiffs/Intervenors faced athletic suspensions, and some were charged with criminal gambling offenses. Several admitted using fraudulent sportsbook accounts.

Plaintiffs/Intervenors brought Section 1983 claims, alleging violations of their Fourth and Fourteenth Amendment rights. But the district court correctly dismissed those claims, concluding that

Defendants are entitled to qualified immunity because no clearly established right was violated. In Fourth Amendment cases, the specificity of the clearly established right is "especially important." *Dean v. Searcey*, 893 F.3d 504, 519 (8th Cir. 2018). And as the district court explained, Plaintiffs/Intervenors cannot cite any controlling authority discussing similar circumstances as here, because there is none. After all, novel technology is at issue. Defendants are thus entitled to qualified immunity.

Applying Eighth Circuit and Supreme Court precedent, this Court should affirm the district court's dismissal of the complaints.

## STATEMENT OF THE CASE

### A. Iowa Legalizes and Regulates Sports Wagering.

Online sports wagering was illegal in Iowa until 2019, when the Iowa Legislature enacted Iowa Code chapter 99F, authorizing a "system of wagering on a gambling game and sports wagering." Iowa Code § 99F.3. Iowa's Legislature was responding to *New Jersey Thoroughbred Horsemen's Association v. National Collegiate Athletic Association*, 584 U.S. 453, 486 (2018), which invalidated the federal prohibition on state-authorized sports gambling.

Chapter 99F defines "[s]ports wagering" as "the acceptance of wagers on an authorized sporting event or sports-related event by any system of wagering as authorized by the" Iowa Racing and Gaming Commission. Iowa Code § 99F.1(29); *see also* 491 Iowa Admin. Code r. 13.1. The statute permits "advance deposit sports wagering," allowing eligible individuals to fund accounts with licensed operators and place wagers using those balances. Iowa Code § 99F.9(4)(*a*)(1). The law specifically contemplates wagering through internet sites and mobile applications operated by licensed entities. *Id.* §§ 99F.7, 99F.7A(3).

Only "eligible individual[s]"—those at least twenty-one years old and physically located in Iowa—may lawfully place wagers. *Id.* § 99F.9(4)(*a*)(3). Users must create accounts with licensed operators such as FanDuel or DraftKings, fund those accounts, and place wagers through approved systems. *Id.* § 99F.9(4)(*a*)(1).

At all relevant times, Plaintiffs and Intervenors were Iowa residents and student-athletes at Iowa State University, the University of Iowa, or Ellsworth Community College. App.6–8, R.Doc.32 at 2–4; App.87–88, R.Doc.33 at 2–3. Between February 2020 and December 2022, they downloaded one or more sportsbook applications and either

created sportsbook accounts or used accounts created by others. App.12, R.Doc.32 at 8; App.91, R.Doc.33 at 6.

### B. Comprehensive Regulatory Scheme and Monitoring Requirements.

Because mobile devices now effectively serve as the gateway to wagering, Iowa imposes extensive regulatory obligations on licensed sportsbooks. *See* 491 Iowa Admin. Code r. 13.5(3). Those rules establish that operators have an "affirmative responsibility and continuing duty" to implement "internal controls" and "reasonable methods" to prevent unlawful activity. *Id.* r. 13.2(7).

Among other requirements, sportsbooks must "prohibit wagering" by athletes, coaches, trainers, officials, and others directly involved in sporting events. *Id.* r. 13.2(7)(*a*); Iowa Code § 99F.7A(4). They must also "identify and suspend accounts" held by underage individuals, report criminal or disciplinary proceedings, and disclose suspicious wagering activity. 491 Iowa Admin. Code r. 13.2(7)(*b*)–(*d*). Such suspicious activity includes account sharing, use of false identification, or wagering intended to conceal illegal conduct. *Id.*

The regulations also require sportsbooks to report that information to the Iowa Racing and Gaming Commission, which must share it with

law enforcement, including DCI. Iowa Code § 99F.12(2)(*b*). Operators, the sportsbooks, must report violations within 72 hours and are prohibited from permitting or failing to detect cheating. 491 Iowa Admin. Code rs. 13.2(2), (7)(*e*).

To enforce geographic restrictions, sportsbooks must implement location-detection controls capable of identifying and monitoring a user's location when placing wagers. *Id.* r. 13.5(3)(*b*). Those systems must reject wagers placed outside permitted boundaries and detect potentially fraudulent or unauthorized activity. *Id.*

In practice, Iowa sportsbooks rely on geolocation technology provided by vendors like GeoComply, a licensed company that contracts with operators like FanDuel and DraftKings. App.457–58, R.Doc.42 at 235–36. Geolocation technology records a user's device location at discrete intervals when the betting application is active to confirm compliance with Iowa's in-state wagering requirement. *See Frequently Asked Questions*, GeoComply, https://perma.cc/7UYS-D5VE (last visited May 18, 2026). App.344, R.Doc.42 at 122; App.357, R.Doc.42 at 125; App.457–59, R.Doc.42 at 235–37. GeoComply displays anonymized location data as points on a map corresponding to when and where a

device accessed a sportsbook application. App.17–19, R.Doc.32 at 13–15. Additional software utilized by GeoComply, Kibana, allows those reviewing the data to filter it by geographic boundaries and identify associated account numbers. App.19, R.Doc.32 at 15. Those tools can compile historical geolocation data for specific accounts over time. App.19, R.Doc.32 at 15.

Sportsbook application users voluntarily provide geolocation data when using sportsbooks applications, and the data may be shared with regulators or law enforcement consistent with statutory and contractual obligations. *See id.* Sportsbook user agreements reinforce those requirements. The user agreements prohibit account sharing, require accurate registration information, and notify users that suspicious or illegal activity may be reported to authorities. App.234, R.Doc.42 at 12; App.244, R.Doc.42 at 22; App.258, R.Doc.42 at 36; App.283, R.Doc.42 at 61; App.353, R.Doc.42 at 130. Users also consent to monitoring their wagering activity and geolocation data and acknowledge that certain individuals—including college athletes—are prohibited from wagering. App.283, R.Doc.42 at 61.

### C. Plaintiffs'/Intervenors' Conduct and Resulting Investigation.

The complaints do not identify when, where, or even whether each Plaintiffs/Intervenors placed wagers. But it implies that several Plaintiffs/Intervenors engaged in prohibited conduct, including wagering through others' accounts in violation of Iowa law, sportsbooks terms, and NCAA rules. Some Plaintiffs/Intervenors were underage or otherwise gambling illegally, and several admitted such violations in related criminal proceedings. App.366, R.Doc.42 at 144; App.373, R.Doc.42 at 151; App.386, R.Doc.42 at 164; App.393, R.Doc.42 at 170; App.400, R.Doc.42 at 178; App.408, R.Doc.42 at 186; App.425, R.Doc.42 at 203; App.436, R.Doc.42 at 214; App.443, R.Doc.42 at 221; App.450, R.Doc.42 at 228; App.467, R.Doc.42 at 245; App.817, R.Doc.43-2 at 211; App.823, R.Doc.43-2 at 217; App.831, R.Doc.43-2 at 225; App.835, R.Doc.43-2 at 226.

Reflecting its statutory obligations, DCI established a sports wagering unit to investigate fraud and other illegal gambling activity. App.11, R.Doc.32 at 7; R. Doc. 42 at 235–36. GeoComply later worked with Iowa regulators and law enforcement, and—after Commission approval—provided DCI with access to its geolocation tools. App.11,

R.Doc.32 at 7; App.16, R.Doc.32 at 12; App.19, R. Doc. 32 at 15; App.457–58, R.Doc.42 at 235–36.

Plaintiffs/Intervenors allege that DCI agents accessed anonymized geolocation data through GeoComply's software without a warrant and used mapping tools to identify sportsbooks activity within athletic facilities. App.18–20, R.Doc.32 at 14–16; App.99, R.Doc.33 at 14. By drawing geographic boundaries around those facilities, agents identified account numbers associated with activity occurring in locations accessible only to athletes and related personnel—individuals prohibited from wagering. App.19–20, R.Doc.32 at 15–16; App.99, R.Doc.33 at 14.

Using those account identifiers, DCI issued subpoenas to FanDuel and DraftKings seeking detailed account information, including user identities, financial records, device data, and wagering histories. App.22, R.Doc.32 at 22.; App.102, R.Doc.33 at 17. More subpoenas were issued to universities and GeoComply. App.25, R.Doc.32 at 21; App.27–28, R.Doc.32 at 23–24. Based on that information, law enforcement secured search warrants, seized cell phones, and pursued criminal charges against certain Plaintiffs/Intervenors. App.25, R.Doc.32 at 21.; App.113, R.Doc.33 at 28.

Plaintiffs/Intervenors allege those investigative steps—including access to geolocation data and issuance of subpoenas—occurred without a warrant or probable cause. App.18, R.Doc.32 at 14; App.20, R.Doc.32 at 16; App.100, R.Doc.33 at 15.

### D. Suspensions, Criminal Proceedings, and Alleged Damages.

Between May 2023 and February 2024, some Plaintiffs/Intervenors were suspended from collegiate athletics. App.26, R.Doc.32 at 22.; App.106, R.Doc.33 at 21. Many—but not all—were also criminally charged. App.34–65, R.Doc.32 at 30–61; App.112–27, R.Doc.33 at 27–42. Some cases resulted in guilty pleas, while others were dismissed. App.34–65, R.Doc.32 at 30–61; App.112–27, R.Doc.33 at 27–42.

Plaintiffs/Intervenors attribute their alleged damages mainly to their suspensions from athletics. App.34–65, R.Doc.32 at 30–61; App.112–27, R.Doc.33 at 27–42. But the complaints do not identify who imposed the suspensions, when they were imposed relative to the investigation, or how Defendants caused them. In several instances, the suspensions predated criminal charges or occurred independently of any charges. App.34–65, R.Doc.32 at 30–61; App.112–27, R.Doc.33 at 27–42. Other Plaintiffs/Intervenors were suspended despite never being

criminally charged. App.34–65, R.Doc.32 at 30–61; App.112–27, R.Doc.33 at 27–42.

### E. Plaintiffs/Intervenors Sue and Defendants Move to Dismiss.

Plaintiffs/Intervenors sued Defendants—all Iowa law enforcement officers—alleging violations of their Fourth and Fourteenth Amendment rights. App.66–82, R.Doc.32 at 62–78; App.128–34, R.Doc.33 at 43–49. In their amended complaint, Plaintiffs asserted five counts: 1) unreasonable searches based on Defendants' use of GeoComply data, 2) unreasonable seizures based on Defendants' use of that same data, 3) unreasonable searches based on allegedly unlawful subpoenas issued based off that data, 4) unreasonable seizures based on those subpoenas, and 5) failure to intervene. App.66–82, R.Doc.32 at 62–78.

The district court granted Intervenors' unresisted motion to intervene. R.Doc.30. Intervenors—also college athletes at Iowa institutions—raised similar Fourth and Fourteenth Amendment claims, asserting three counts: 1) unreasonable searches based on Defendants' use of GeoComply data, 2) unreasonable seizures and allegedly unlawful subpoenas based on Defendants' use of GeoComply data, and 3) failure to intervene. App.128–34, R.Doc.33 at 43–49. Both Plaintiffs and

Intervenors sought damages and attorneys' fees. App.83, R.Doc.32 at 79; App.135, R.Doc.33 at 50.

Defendants moved to dismiss both complaints based on qualified immunity. Defendants asserted that a constitutional violation did not occur, and even if one did occur, they are entitled to qualified immunity because the alleged violation was not clearly established. App.208, R.Doc.41-1 at 67; App.592, R.Doc.43-1 at 48.

On the merits of whether a violation occurred, Defendants argued that certain Plaintiffs lacked Fourth Amendment standing because they "had no reasonable or actual expectation of privacy in gambling accounts they didn't own." App.166, R.Doc.41-1 at 25. Defendants also contended that Plaintiffs failed to plead a constitutional violation, asserting that Plaintiffs had no reasonable expectation of privacy in their location data; that the alleged surveillance is not a Fourth Amendment search; that the third-party doctrine bars the claims; and that the conduct at issue did not involve a traditional "geofence search" because it did not rely on cell-site location information ("CSLI") data. App.170–71, R.Doc.41-1 at 29–30; App.173, R.Doc.41-1 at 32; App.175, R.Doc.41-1 at 34; App.177, R.Doc.41-1 at 36; App.183, R.Doc.41-1 at 42. Defendants also argued

that, even if a search occurred, Plaintiffs consented to it and, alternatively, that no warrant was required due to "special needs." App.187, R.Doc.41-1 at 46; App.190, R.Doc.41-1 at 49. In addition, Defendants maintained that no unconstitutional seizure occurred. App.198, R.Doc.41-1 at 57.

Defendants also argued that the subpoenas issued during the investigation were lawfully supported. App.202, R. Doc.41-1 at 61. And Defendants contended that Plaintiffs failed to state a viable failure-to-intervene claim. App.207, R.Doc.41-1 at 66. Finally,

As to Intervenors, Defendants advanced largely the same arguments for dismissal. They contended that certain Intervenors lack standing and that all failed to plausibly allege an unconstitutional search and seizure for the same reasons asserted against Plaintiffs. App.556–59, R.Doc.43-1 at 12–15. Defendants also argued that Intervenors failed to state a plausible failure-to-intervene claim. App.591, R.Doc.43-1 at 47.

### F. District Court Grants Motion to Dismiss.

The district court granted Defendants' motion to dismiss as to all counts. First, the district court found that all Plaintiffs/Intervenors had standing "because each is asserting their own reasonable expectation of

privacy in their geolocation data and catalog of physical movements complied by Defendants without a warrant." App.941, R.Doc.89 at 13.

As to the unlawful-geolocation-search claims (Counts I) raised by Plaintiffs and Intervenors, the district court determined that Defendants' warrantless compilation and use of historical geolocation data violated the Fourth Amendment. App.942, R.Doc.89 at 14. The district court reasoned that "a user does not intentionally share geolocation data in a way that defeats their reasonable expectation of privacy in their physical movements by using a gambling app." App.948, R.Doc.89 at 20. It also concluded that the core principles underlying *Carpenter v. United States*, 585 U.S. 296 (2018) applied to the technology at issue. App.949, R.Doc.89 at 21. Accordingly, the district court held that Plaintiffs/Intervenors "have a reasonable expectation of privacy in the record of their physical location and movements," and that Defendants were required to obtain a warrant before conducting such a search as they did here. App.952, R.Doc.89 at 24. Because Defendants failed to obtain a warrant, Plaintiffs/Intervenors adequately alleged a violation of their Fourth Amendment right to be free from unreasonable searches. App.952–53, R.Doc.89 at 24–25.

Even so, the district court concluded that Defendants were entitled to qualified immunity because the unconstitutionality of the geolocation search was not clearly established at the time. App.955, R.Doc.89 at 27. The district court found that Plaintiffs/Intervenors failed to meet their burden to show that the right was clearly established, noting that they did "not cite to any controlling authority or a robust set of persuasive authority clearly establishing this right," nor could they have because this is a "novel" issue. App.954–55, R.Doc.89 at 26–27.

The district court next addressed Plaintiffs' unlawful-subpoena-search claims (Count III), which alleged that Defendants violated the Fourth Amendment through their use of subpoenas. App.955, R.Doc.89 at 27. It concluded that, because "the unconstitutionality of Defendants' search which supported the subpoena was not clearly established at the time of the search," Defendants were again entitled to qualified immunity. App.956, R.Doc.89 at 28. The district court also determined that the subpoenas served a lawful purpose, despite Plaintiffs' assertions to the contrary. App.956, R.Doc.89 at 28. Accordingly, the district court dismissed Plaintiffs' Count III. App.956, R.Doc.89 at 28.

The district court then turned to Plaintiffs' and Intervenors' claims that Defendants unreasonably seized their phones and data in violation of the Fourth Amendment: Plaintiffs' unlawful-seizure claims (Counts II and IV) and Intervenors' unlawful-seizure claim (Count II). App.957, R.Doc.89 at 29. With respect to the phones, the district court again found that Defendants were entitled to qualified immunity because the warrants authorizing the seizures were supported by the geolocation information obtained from the search, and the unconstitutionality of that underlying search was not clearly established at the time. App.957, R.Doc.89 at 29. The district court also found that "Plaintiffs fail[ed] to allege Defendants knowingly or recklessly included a false statement in the warrant affidavit," and thus could not overcome qualified immunity. App.959, R.Doc. 89 at 31.

As for the data, the district court concluded that the claim failed for two reasons. First, "Plaintiffs and Intervenors do not allege how they were deprived of their ability to access or use that information," meaning Defendants did not "meaningfully interfere" with their possessory interest." App.960, R.Doc.89 at 32. Second, the district court held that a privacy interest in data does not establish "a sufficient basis for a

possessory interest, as understood under the Fourth Amendment." App.960, R.Doc.89 at 32. The district court therefore dismissed Plaintiffs' Counts II and IV and Intervenors' Court II. App.960, R.Doc.89 at 32.

Finally, the district court addressed Plaintiffs' and Intervenors' failure-to-intervene claims (Counts V and III), concluding that it need not decide whether such claims are cognizable because "even if such a claim was cognizable, Defendants would be entitled to qualified immunity." App.961, R.Doc.89 at 33. The district court thus dismissed Plaintiffs' Count V and Intervenors' Count III. App.961, R.Doc.89 at 33. The district court also denied Intervenors' request for leave to amend, finding that any amendment would be "futile" considering the qualified immunity defense. App.962, R.Doc.89 at 34.

This appeal followed.

## SUMMARY OF THE ARGUMENT

I. The district court correctly concluded that Defendants are entitled to qualified immunity. Plaintiffs/Intervenors have not shown the violation of any clearly established Fourth Amendment right. At most, they allege that Defendants reviewed geolocation data obtained from third-party sportsbook operators and GeoComply and later relied on that

information to seek subpoenas and warrants. But Plaintiffs/Intervenors provide no authority addressing similar factual circumstances clearly establishing that law enforcement's review or use of such third-party records in an investigation is unconstitutional. Because Plaintiffs/Intervenors cannot show that Defendants' conduct violated clearly established law, qualified immunity applies to all claims, and the district court properly dismissed the complaint.

II. Defendants did not commit a constitutional violation and thus are entitled to qualified immunity on the merits. Several Plaintiffs/Intervenors admit they used others' accounts, which deprives them of Fourth Amendment standing. And Plaintiffs/Intervenors cannot plausibly allege a reasonable expectation of privacy in third-party gambling accounts or voluntarily disclosed location data—defeating a Fourth Amendment claim. Because there was no unconstitutional search, Plaintiffs/Intervenors arguments as to subpoenas and warrants fails as derivative.

This Court should affirm the district court's grant of the motion to dismiss.

## ARGUMENT

### I. Standard of Review.

This Court reviews the dismissal of a complaint under Rule 12(b)(6) de novo. *Mungai v. Univ. of Minn.*, 141 F.4th 959, 963 (8th Cir. 2025). To survive a motion to dismiss, a complaint "must provide enough facts to state a claim that is plausible on its face." *Id*. The complaint must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But that "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* Pleadings containing "labels and conclusions," "formulaic recitation of the elements of a cause of action," or "mere conclusory statements" will not suffice. *Id.* (citation omitted). And while the court accepts factual allegations as true, that "is inapplicable to legal conclusions." *Id.*

### II. The District Court Correctly Dismissed the Complaint Because Defendants are Entitled to Qualified Immunity.

Qualified immunity protects government officials from liability for constitutional violations unless the right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Qualified immunity analyzes claims under a two-step analysis, with the first step being to determine if a plaintiff has sufficiently alleged a violation of a constitutional right, and the second being whether that right was clearly established at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001). And a defendant may prevail on either of the steps for qualified immunity to apply. *Pearson*, 555 U.S. at 244–45 (holding offices were entitled to qualified immunity because right was not clearly established without deciding if there was a constitutional violation). Therefore, this Court may affirm dismissal based on either qualified immunity prong. *See Lombardo v. City of St. Louis*, 38 F.4th 684, 690 (8th Cir. 2022) (consistent with the principle against unnecessary constitutional rulings, the court "consider[ed] only whether the right was clearly established because it is dispositive to this appeal").

Defendants are entitled to qualified immunity on all counts. Plaintiffs fail to cite authorities clearly establishing the law as to their unconstitutional-search and failure-to-intervene claims. Their remaining claims fall with the search claims, because their subpoena, warrant, and seizure claims, as pleaded, are merely derivative of their

unconstitutional-search claims. The Court therefore should affirm the dismissal of Plaintiffs' and Intervenors' complaints.

### A. Qualified immunity as to searches.

"Qualified immunity shields a government official from suit under § 1983 if his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Kelsay v. Ernst*, 933 F.3d 975, 979 (8th Cir. 2019) (en banc) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To overcome qualified immunity, a plaintiff must point to "controlling authority" that "placed the statutory or constitutional question beyond debate" when the alleged violation occurred. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011). That authority "at the time of the events in question must have given the officers fair warning that their conduct was unconstitutional." *Kelsay*, 933 F.3d at 979 (cleaned up); *see also Ryno v. City of Waynesville*, 58 F.4th 995, 1004–05 (8th Cir. 2023).

That authority likely must come from the Supreme Court; indeed, it is an open question whether even "controlling Circuit precedent" can clearly establish law for qualified immunity purposes. *Zorn v. Linton*, 146

S. Ct. 926, 930 n.3 (2026) (quoting *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021)).

At a minimum, Plaintiffs must identify controlling precedent from this Court, since merely persuasive authority is insufficient to clearly establish the law in this circuit. As there is no binding Eighth Circuit precedent on the constitutionality of these searches, Plaintiffs/Intervenors face an insurmountable qualified immunity bar. *See Patel v. Lanier County*, 969 F.3d 1173, 1187 (11th Cir. 2020) (even if this circuit has cited with approval a Sixth Circuit case with analogous facts, that cannot clearly establish the law for qualified immunity purposes because only cases from the Supreme Court, this circuit, and the highest court of the state under whose law the claim arose clearly establishes law in this circuit).

Courts cannot "define clearly established law at a 'high level of generality,' because that approach 'avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *T.S.H. v. Green*, 996 F.3d 915, 918 (8th Cir. 2021) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)). And "[s]pecificity of the rule is especially important in the Fourth Amendment Context."

*Green*, 996 F.3d at 918 (citation omitted). The inquiry requires a "high degree of specificity" because a "rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Wesby*, 583 U.S. at 63 (cleaned up). And "a rule is too general if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that the rule was firmly established." *Id.* at 64 (cleaned up).

The district court correctly concluded that "[t]he ability to surveil a person's historical geolocation data using an app's verification system is novel and courts have yet to reach a consensus on the constitutionality of such searches," and therefore that Defendants were entitled to qualified immunity. App.954–955, R.Doc.89 at 26–27. As the court explained, Plaintiffs/Intervenors failed to meet their burden because Plaintiffs/Intervenors "do not cite to any controlling authority or a robust set of persuasive authority clearly establishing this right nor could they." App.954, R.Doc.89 at 26. This Court should affirm.

### 1. The right is not clearly established.

Plaintiffs/Intervenors cannot overcome qualified immunity because they cannot show that the alleged unlawfulness of Defendants' conduct

was clearly established at the time of the challenged searches. *See Green*, 996 F.3d at 918.

Plaintiffs/Intervenors cannot meet that standard here. The Fourth Amendment question presented—whether law enforcement may review voluntarily-shared historical geolocation data obtained through an app-based verification system, adhering to a State's regulated sports wagering framework—has not been resolved by "controlling authority" or "a robust consensus of cases of persuasive authority." *al-Kidd*, 563 U.S. at 741–42 (cleaned up). At most, it presents a developing and unsettled area of Fourth Amendment doctrine involving evolving digital-location technologies and corporate data collection practices.

Plaintiffs/Intervenors argue that qualified immunity does not apply because "existing precedent place[s] the constitutional question beyond debate." Brief of Appellants at 27. But their cited precedents cannot bear that weight. Rather, courts addressing analogous geolocation and digital-location issues have repeatedly acknowledged that existing precedent does not definitively answer those questions. One federal district court summarized it well, explaining that geofence and related digital-location doctrine is a "new area of law" that remains "evolving;" indeed,

"technological advances coupled with corporate data collection" present "new and consequential Fourth Amendment questions" not squarely governed by existing precedent. *United States v. Rhine*, 652 F.Supp.3d 38, 66, 75 (D.D.C. 2023).

Another court characterized this area as a "quagmire," observing that even foundational questions remain unresolved as to whether such data collection constitutes a search at all. *See, e.g., United States v. Davis*, 2022 WL 3009240, at *9 (M.D. Ala. July 1, 2022*), report and recommendation adopted*, 2022 WL 3007744 (M.D. Ala. July 28, 2022), *aff'd*, 109 F.4th 1320 (11th Cir. 2024). That court explained that *Carpenter* left important questions unanswered, leaving courts to decide "just how long is a piece of string." *Id.* at *7. Courts thus remain in "uncharted territory" when evaluating geofence-type location issues. *Id.* (citation omitted).

Still other courts have recognized that courts "have reached varying conclusions" on the Fourth Amendment issues related to geofencing, while noting that "some prominent legal scholars have questioned whether the access of geofence information constitutes a search under the Constitution" at all. *United States v. Kirkendoll*, 2024 WL 1016049,

at *1 n.1 (D.N.M. Mar. 8, 2024). That court observed that "courts in other districts have assumed without deciding that a warrant is required for the government to obtain geofence location information," but that the constitutionality of geofence-type location collection remains an "open question." *Id.* at *2.

That body of authority confirms what matters for the qualified immunity analysis here: even courts expressing constitutional concerns about digital-location or geofence searches simultaneously recognize that the governing doctrine remains unsettled. Defendants here "cannot be expected to predict the future course of constitutional law" when it comes to geofence searches. *Procunier v. Navarette*, 434 U.S. 555, 562 (1978). Plaintiffs'/Intervenors' reliance on general Fourth Amendment principles, isolated opinions, or policy concerns cannot substitute for clearly established law placing the constitutional question "beyond debate." *al-Kidd*, 563 U.S. at 741; *see* Brief of Appellants at 21–30.

Because this issue falls in an evolving area in which courts have reached varying conclusions, the district court correctly concluded that Defendants are entitled to qualified immunity. App.955, R.Doc.89 at 27.

### 2. Even if a clear Fourth Amendment rule existed, reasonable officers could believe the conduct was lawful.

Even where there is a clear, general Fourth Amendment rule, closely analogous facts are required to defeat qualified immunity. Qualified immunity analysis must be conducted "in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. That specificity requirement is strong in Fourth Amendment cases where constitutional standards are often articulated at a high level of generality and officers must determine how those standards apply to the "factual situation the officer confronts." *Id.* at 205. Thus, the dispositive question is not whether Plaintiffs/Intervenors can articulate an abstract Fourth Amendment principle, but whether existing precedent placed the unlawfulness of Defendants' conduct "beyond debate" here. *al-Kidd*, 563 U.S. at 741.

The Supreme Court has repeatedly emphasized that clearly established law must be defined with a "high degree of specificity," especially in the Fourth Amendment context. *Wesby*, 583 U.S. at 63 (cleaned up). General constitutional rules rarely suffice because "it is sometimes difficult for an officer to determine how the relevant legal

doctrine . . . will apply to the factual situation the officer confronts." *Saucier*, 533 U.S. at 205. Accordingly, qualified immunity protects officers when there is "mistake as to what the law requires is reasonable." *Id.* The inquiry is objective and turns on "whether the officers' actions were objectively reasonable in light of the facts and circumstances, without regard to their underlying intent or motivation." *Howard v. Kan. City Police Dept.*, 570 F.3d 984, 989 (8th Cir. 2009) (cleaned up).

Plaintiffs/Intervenors cannot show that existing precedent made it clear enough to every reasonable officer that the specific conduct at issue here violated the Constitution. Defendants operated within a comprehensive statutory and regulatory framework governing online sports wagering in Iowa. Betting-app users knowingly and voluntarily shared their locations to gamble online and agreed that such data could be disclosed to vendors, regulators, or law enforcement. App.228–32, R.Doc.42 at 6–9; App.233–35, R.Doc.42 at 11–13; App.237, R.Doc.42 at 15; App.259, R.Doc.42 at 37; App.271, R.Doc.42 at 49; App.344, R.Doc.42 at 122; App.352, R.Doc.42 at 130.

At the same time, Iowa regulations separately require sportsbooks to monitor geolocation data for suspicious wagering activity and report

that activity to the Commission, which is required to share information with DCI. *See* 491 Iowa Admin. Code r. 13.5(3)(*b*); Iowa Code § 99F.12(2)(*b*). And the Commission expressly authorized DCI's review under Iowa Code section 99F.12(2)(*b*). App.15–16, R.Doc.32 at 11–12.

Against that backdrop, no precedent made it "sufficiently clear" to an objectively reasonable officer that reviewing geolocation data violates the Fourth Amendment. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). To the contrary, existing precedent long recognizes that individuals generally lack a reasonable expectation of privacy in information voluntarily disclosed to third parties. *Smith v. Maryland*, 442 U.S. 735, 743–44 (1979); *United States v. Miller*, 425 U.S. 435, 433 (1976).

Whatever limits later cases may place on application of the third-party doctrine to digital information, Plaintiffs/Intervenors identify no controlling case addressing facts remotely like these: geolocation data voluntarily shared with regulated sportsbooks, subject to mandatory monitoring and reporting requirements, and disclosed pursuant to statutory authorization within a state gaming-regulation framework.

Absent such precedent, the alleged unlawfulness of Defendants' conduct was not "sufficiently clear that every reasonable official would

have understood" the conduct to be unconstitutional. *al-Kidd*, 563 U.S. at 741 (cleaned up).

The statutory and regulatory authorization further reinforces that conclusion. Although statues cannot override constitutional limits, the "existence of a statute or ordinance authorizing particular conduct is a factor which militates in favor of the conclusion that a reasonable official would find that conduct constitutional." *Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994); *see also Meehan v. Thompson*, 763 F.3d 936, 945 (8th Cir. 2014) (statutes do not "override" a plaintiff's constitutional rights, but they "illustrate[]" reasonableness of an officer's conduct). The legal framework here expressly contemplated the collection, monitoring, and sharing of geolocation information tied to suspicious wagering activity. *See* 491 Iowa Admin. Code r. 13.5(3)(*b*); Iowa Code § 99F.12(2)(*b*). In the absence of closely analogous precedent holding such conduct unconstitutional, objectively reasonable officers could believe their conduct complied with the Fourth Amendment.

### 3. The district court correctly defined the right.

Plaintiffs/Intervenors argue that "the district court defined the right at an impermissibly high level of specificity" and that reversal is

therefore warranted. *See* Brief of Appellants at 21. According to Plaintiffs/Intervenors, the district court improperly "required precedent involving the same technology and investigative context." *See* Brief of Appellants at 21–22. But Plaintiffs/Intervenors never articulate what the correct formulation of the right should be.

The district court did not require precedent involving identical technology or investigative circumstances. Instead, it correctly concluded that Plaintiffs/Intervenors failed to identify "controlling authority or a robust set of persuasive authority clearly establishing" the alleged constitutional violation in this context. App.954, R.Doc.89 at 26. In doing so, the district court properly considered the novelty of the technology method, the unsettled application of *Carpenter* to emerging geolocation technologies, and the conflicting post-*Carpenter* authority addressing analogous searches. *See United States v. Pricop*, 775 F.Supp.3d 1036, 1038–39 (D. Ariz. 2025) (discussing differing ways courts have applied *Carpenter*); *United States v. Smith*, 110 F.4th 817, 830–36 (5th Cir. 2024), *cert. denied*, 146 S. Ct. 356 (2025) (discussing whether geofencing is a search under the Fourth Amendment); *United States v. Chatrie*, 107 F.4th 319, 331 (4th Cir. 2024), *on reh'g en banc*, 136 F.4th 100 (4th Cir.

2025), *cert. granted in part*, 223 L. Ed. 2d 553 (Jan. 16, 2026) (concluded no Fourth Amendment search when government obtained individual's location history data from Google). App.955, R.Doc.89 at 27.

Plaintiffs/Intervenors next rely on *Taylor v. Riojas*, 592 U.S. 7 (2020), to argue that the district court's approach was foreclosed. That reliance is misplaced. *Taylor* confirms that, in rare cases involving extreme and "egregious facts," "any reasonable officer should have realized" that there was a constitutional violation occurring. *Id.* at 9. But that court was discussing the facts of the case before it when stating that "no reasonable correctional officer could have concluded that, under the extreme circumstances of *this case*, it was constitutionally permissible" to perform the conduct they did. *Id.* at 8 (emphasize added).

Indeed, *Taylor* did not alter the settled rule that clearly established law must place the constitutional question "beyond debate" and provide officers "fair warning that their conduct was unconstitutional." *Kelsay*, 933 F.3d at 979 (cleaned up). Nor did *Taylor* eliminate the requirement that courts are to define the constitutional right considering the specific context confronting the officers rather than at a high level of generality. *Wesby*, 583 U.S. at 63. Rather, *Taylor* followed Supreme Court precedent

holding a right may be clearly established in rare circumstances where conduct is so egregious that the violation would be obvious to any reasonable person, despite the lack of analogous precedent.

But Plaintiffs/Intervenors' "obviousness" theory is forfeited because they do not meaningfully develop it on appeal. *See United States v. Roberts*, 881 F.3d 1049, 1053 (8th Cir. 2018); Fed. R. App. P. 28(a)(8)(A). Aside from asserting in conclusory fashion that it is "obvious" that conducting a warrantless search without reasonable suspicion or probable cause violates the Fourth Amendment, Plaintiffs/Intervenors provide no developed analysis explaining why this case falls within the narrow category of "obvious" constitutional violations recognized by the Supreme Court. *See* Brief of Appellants at 26. Such conclusory assertions are insufficient to overcome qualified immunity.

Nor does this case fall within the narrow "obvious" exception. In *Hope v. Pelzer*, the Court explained that the exception applies when obviousness of a substantial risk could support an inference of deliberate indifference in the Eight Amendment prison-conditions context. 536 U.S. 730, 737–38 (2002) (finding an "obvious" constitutional violation where prison officials handcuffed an inmate to a hitching post for seven hours

after any safety threat was gone, exposing him to unnecessary pain, heat, thirst, and humiliation). But that context-specific principle does not eliminate the requirement that Fourth Amendment claims be governed by clearly established law defined with a high degree of specificity in controlling precedent. To the contrary, as discussed above, courts addressing analogous digital-location and geofence issues have repeatedly recognized that the governing Fourth Amendment doctrine remains unsettled. That uncertainty alone confirms that the alleged unlawfulness of Defendants' conduct was not "obvious" to every reasonable officer.

To the extent that Plaintiffs/Intervenors rely on officers' internal emails, their argument fares no better and is forfeit. In their statement of facts, they point to internal discussions in emails among officers. *See* Brief of Appellants at 16. But Plaintiffs/Intervenors fail to develop any related argument based on those emails, *Roberts*, 881 F.3d at 1053, and those discussions fail to clearly establish anything. After all, qualified immunity turns on an objective inquiry governed by controlling precedent, not internal communications or officials' subjective views

about unsettled legal questions or policy views. *See Anderson*, 483 U.S. at 641.

At most, the cited emails reflect post hoc discussion of potential administrative reporting and broader policy implications following the investigation, including possible institutional and legislative action, thus underscoring that officials were operating in an area of evolving Fourth Amendment doctrine rather than one governed by clearly established rules. App.101, R.Doc.33 at 16. Such internal commentary about how conduct might be characterized or reported does not establish a Fourth Amendment violation, nor does it clearly establish law for qualified immunity purposes.

The district court therefore grounded its qualified immunity ruling on the lack of settled law placing the constitutional question beyond debate in this evolving area of Fourth Amendment jurisprudence. Because Plaintiffs/Intervenors identified no such clearly established authority, the district court correctly concluded that qualified immunity applies. App.955, R.Doc.89 at 27.

#### 4. Plaintiffs' authorities fail to establish that their asserted right was clearly established.

Plaintiffs/Intervenors rely primarily on *Kyllo v. United States*, 533 U.S. 27 (2001), *Riley v. California,* 573 U.S. 373 (2014), and *Carpenter* to argue that "the law in 2023 was clearly established that conducting a dragnet search of someone's historical location data without a warrant, without probable cause, and without individualized suspicion would violate the Fourth Amendment." Brief of Appellants at 23. They also cite *United States v. Sesay*, 937 F.3d 1146 (8th Cir. 2019) to argue that "the third-party doctrine does not apply to cell phone location records." Brief of Appellants at 25.

But those authorities do not satisfy the clearly established standard required to overcome qualified immunity. Those cases articulate general Fourth Amendment principles concerning evolving technology and privacy interests, but none involved the type of law enforcement action at issue here—law enforcement's review of commercially available geolocation history obtained from a third-party provider in the context of a highly-regulated industry. *See Green*, 996 F.3d at 918 ("Specificity of the rule is especially important in the Fourth Amendment context." (cleaned up)). This Court should not define the right at such a general

level. *See Zorn*, 146 S. Ct. at 930 (summarily reversing and requiring a "high degree of specificity" for a right to be clearly established).

As the district court correctly recognized, Plaintiffs/Intervenors had to show "more than that their historical geolocation data was searched in general contravention of the Fourth Amendment." App.953–54, R.Doc.89 at 25–26. They instead had to show "specifically that their right to be free from Defendants' use of software to catalog and search the historical geolocation data automatically generated by a phone application without a warrant was clearly established at the time Defendants conducted their search." App.954, R.Doc.89 at 26. Plaintiffs/Intervenors did not do so and cannot do so based on their proffered, factually distinguishable precedents.

*Kyllo* addressed thermal imaging of a home, *Riley* concerned searches of cell phones incident to arrest, and *Carpenter* involved historical cell phone records that gave location information obtained from wireless carriers. *See Kyllo*, 533 U.S. at 29; *Riley*, 573 U.S. at 378; *Carpenter*, 585 U.S. at 300. None of Plaintiffs/Intervenors' cases addressed the possession or review of commercially generated geolocation data voluntarily shared with a third-party application

provider under a regulatory and contractual framework, as is the issue here. At most, those decisions establish broad Fourth Amendment principles concerning certain forms of digital data. But "existing precedent must have placed the statutory or constitutional question beyond debate," and a clearly established right cannot be found in "the broad history and purposes of the Fourth Amendment." *al-Kidd*, 563 U.S. at 741–42 (cleaned up).

Nor does *United States v. Sesay* clearly establish that Defendants' conduct violated the Fourth Amendment. If anything, *Sesay* reinforces the opposite conclusion by applying the third-party doctrine to information voluntarily disclosed to a business. *See Sesay*, 937 F.3d at 1152 ("We conclude that Samaan likewise had no legitimate expectation of privacy in the identification card that he provided when registering at the motel."). There, this Court held a defendant had no reasonable expectation of privacy in a motel registry voluntarily provided to a third party, even while acknowledging *Carpenter's* narrow limitation regarding cell-site location information. *Id.* at 1151–52. This case similarly involves information voluntarily shared with online gambling companies as part of users' account activity and wagering transactions,

coupled with disclosures that such information could be shared with vendors, regulators, or law enforcement. At minimum, *Sesay* shows that the law in this area was unsettled—not "beyond debate." *al-Kidd*, 563 U.S. at 741. That uncertainty defeats Plaintiffs'/Intervenors' attempt to overcome qualified immunity.

Given the absence of controlling precedent addressing materially similar facts, the district court correctly concluded that the alleged unlawfulness of Defendants' conduct was not clearly established at the time of the investigation.

#### 5. *Chatrie* further demonstrates that the law is not clearly established.

Lastly, Plaintiffs/Intervenors argue that "*United States v. Chatrie* confirms—rather than undermines—that the unconstitutionality of Defendants' geolocation search was clearly established." Brief of Appellants at 28. Oddly, Plaintiffs/Intervenors rely on the district court decision, rather than the panel decision (vacated) or one-line en banc majority. *Id.* at 29. If out-of-circuit precedent cannot clearly establish law, surely a district court decision whose appeal is currently being reviewed by the Supreme Court cannot either. In short, *Chatrie* cannot clearly establish anything here because (1) it is out-of-circuit precedent

(2) the Fourth Circuit's opinion was issued in 2024, post-dating the conduct here, (3) it was vacated when the case went en banc, and (4) it is pending at the Supreme Court. Of course, *Chatrie*'s operative en banc opinion itself was an affirmance without reasoning. *See* 136 F.4th at 100.

Perhaps recognizing *Chatrie*'s limitations, Plaintiffs/Intervenors argue that *Chatrie* (the district court opinion) "did not announce a new constitutional rule" but instead applied longstanding Fourth Amendment principles. Brief of Appellants at 28. Plaintiffs/Intervenors focus heavily on *Chatrie's* discussion of whether a constitutional violation occurred and contend there is "an even clearer constitutional violation" here. *Id.* at 29.

But Plaintiffs/Intervenors ignore a central point relevant to qualified immunity: *Chatrie* recognized that geofence searches present a novel and unsettled Fourth Amendment issue. Indeed, the district court expressly acknowledged that the "analysis of geofences does not fit neatly within the Supreme Court's existing 'reasonable expectation of privacy' doctrine as it relates to technology." *United States v. Chatrie*, 590 F.Supp.3d 901, 926 (E.D. Va. 2022). And it categorized the Supreme Court cases about reasonable expectation of privacy as dealing with "*deep*, but perhaps not *wide*, intrusions into privacy." *Id.* The district

court further observed that "these matters are best left to legislatures." *Id.* Far from clearly establishing the law, *Chatrie* confirms that courts are still grappling with how existing Fourth Amendment principles apply to emerging geolocation technologies.

More importantly, Plaintiffs/Intervenors conflate the two distinct inquiries under qualified immunity. Defendants are entitled to qualified immunity unless Plaintiffs/Intervenors can show that both that conduct alleged was unlawful and that the alleged unlawfulness of the conduct was clearly established at the time it occurred. *See Pearson*, 555 U.S. at 232. Thus, even if Plaintiffs have plausibly alleged a constitutional violation, Defendants prevail so long as the asserted right was not clearly established.

So *Chatrie* does not help Plaintiffs/Intervenors. The district court confronted a judicially authorized geofence warrant and acknowledged the absence of clear Fourth Amendment guidance governing such searches. *Chatrie*, 590 F.Supp.3d at 926. That acknowledgment is inconsistent with Plaintiffs'/Intervenors' assertion that the law here was clearly established. If courts recognized geofence and geolocation searches as legally uncertain and novel, then reasonable officers could

not have been on clear notice that their conduct violated the Fourth Amendment. *Chatrie* therefore supports Defendants' position that qualified immunity applies.

**B. Qualified immunity as to subpoenas.**

The district court correctly concluded that Defendants were entitled to qualified immunity as to Plaintiffs' unlawful-subpoena-search claim (Count III), which alleged Defendants violated the Fourth Amendment "by supporting a subpoena for Plaintiffs' activity on their cell phones with illegally seized information obtained from the geofence search." App.73, R Doc.32 at 69; App.955, R.Doc.89 at 27. Thus, as Plaintiffs pleaded, this claim is derivative of their illegal-search claim. The district court rejected that fruit-of-the-poisonous-tree theory because "the unconstitutionality of Defendants' search which supported the subpoena was not clearly established at the time of the search." App.956, R.Doc.89 at 28.

That conclusion is dispositive here. Qualified immunity does not merely bar liability for the initial investigative step in isolation; it shields officials from suit where the governing constitutional rule was not clearly established at the time of the challenged conduct. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (qualified immunity is "an immunity from suit

rather than a mere defense to liability”). Plaintiffs do not allege on appeal that the subpoenas were independently defective, unsupported by lawful process, or procured through knowingly false statements. Instead, Plaintiffs contend only that the subpoenas were invalid because they derived from the earlier geolocation search. *See* Brief of Appellants at 30–31.

Because no clearly established law rendered the initial search unlawful, officers could rely on information obtained from that search in pursuing additional investigative processes. *See Wesby*, 583 U.S. at 63–64. Qualified immunity turns on whether clearly established law gave officers fair notice that their conduct was unconstitutional. *Id.*

Plaintiffs identify no controlling precedent or robust consensus of persuasive authority clearly establishing that Defendants violated the Fourth Amendment by seeking subpoenas based on geolocation information obtained under legally unsettled circumstances. Nor do Plaintiffs separately analyze the clearly established prong as to the subpoenas themselves. Therefore, any argument about that issue is forfeited. *See Roberts*, 881 F.3d at 1053; Fed. R. App. P. 28(a)(8)(A).

Because the legality of the underlying use of a geolocation tool was not clearly established, Defendants are also entitled to qualified immunity for investigative steps that depended on and followed from that same conduct.

### C. Qualified immunity as to warrants and seizures.

The district court also correctly dismissed Plaintiffs'/Intervenors' unlawful seizure claims because Plaintiffs/Intervenors failed to overcome qualified immunity and failed to plausibly allege an unreasonable seizure under the Fourth Amendment. App.958, R.Doc.89 at 30; App.960, R.Doc.89 at 32.

Plaintiffs'/Intervenors' seizure theory on appeal is derivative of their challenge to the underlying geolocation usage, like their subpoena claim. *See* Brief of Appellants at 31–32. They contend the seizures of Plaintiffs' "property" was unconstitutional because Defendants relied on information obtained through the alleged unlawful geolocation search. Brief of Appellants at 32. And that "qualified immunity does not shield searches and seizures premised on tainted information." Brief of Appellants at 31.

As the district court explained, even assuming the geolocation usage was unconstitutional, "the unconstitutionality of the geolocation search was not clearly established at the time of the warrant application." App.957, R.Doc.89 at 29. Accordingly, Defendants' "reasonable mistake of law that collection of Plaintiffs' geolocation data did not require a warrant and so could legally support obtaining a subsequent warrant is entitled to qualified immunity." App.958, R.Doc.89 at 30.

That reasoning forecloses Plaintiffs' downstream seizure claims. Qualified immunity protects officials who make reasonable mistakes about unsettled constitutional questions. *See Pearson*, 555 U.S. at 231. Thus, if reasonable officers could have believed the initial geolocation usage was lawful, reasonable officers likewise could have believed they were permitted to rely on that information in seeking warrants and carrying out resulting seizures. Plaintiffs identify no clearly established law holding otherwise.

Instead, Plaintiffs rely on generalized exclusionary-rule principles drawn from criminal suppression cases. *See United States v. Madrid*, 152 F.3d 1034, 1039–40 (8th Cir. 1998); Brief of Appellants at 32. They contend that "the warrants and subpoenas in this case were issued based

on information illegally obtained through an illegal warrantless search – accordingly, the seizure of Plaintiffs' property as a result of those subpoenas and warrants is also illegal." Brief of Appellants at 32. But exclusionary-rule doctrines governing suppression of evidence in criminal proceedings do not resolve the distinct qualified immunity inquiry applicable in Section 1983 damages actions.

Plaintiffs/Intervenors reliance on *Wong Sun v. United States*, 371 U.S. 471 (1963) is also misplaced. *See* Brief of Appellants at 30–31. The language they invoke—that the Fourth Amendment excludes evidence that is "come at by exploitation" of the initial illegality—states a general attenuation principle for evidentiary issues in criminal cases. *Wong Sun*, 371 U.S. at 488. It does not establish a clearly defined rule governing officer conduct for qualified immunity purposes. And it does not provide specific guidance on the issuance or execution of warrants following investigative steps later alleged to be unlawful or address the circumstances here with the requisite factual particularity.

Rather, *Wong Sun* frames attenuation as a fact-intensive inquiry asking whether evidence was obtained by exploitation of the primary illegality or "instead by means sufficiently distinguishable to be purged

of the primary taint." *Id.* at 487–88 (citation omitted). That standard confirms only a general evidentiary doctrine applied criminal case by criminal case; it does not clearly establish that Defendants' conduct was unconstitutional in these Section 1983 circumstances. *See Wesby*, 583 U.S. at 63. At most, Plaintiffs/Intervenors rely on an abstract exclusionary rule formulation that is too general to place the alleged unlawfulness beyond debate in the qualified immunity context.

And Plaintiffs/Intervenors make no argument on appeal that even if their theory regarding the search is rejected, there is an independent constitutional violation. Any such argument is therefore forfeited. *See Roberts*, 881 F.3d at 1053; Fed. R. App. P. 28(a)(8)(A). The relevant question, in any event, is whether clearly established law placed the constitutional question "beyond debate." *al-Kidd*, 563 U.S. at 741. And Plaintiffs/Intervenors make no such showing here. Therefore, they cannot overcome qualified immunity.

### D. Qualified immunity as to failure-to-intervene claim.

The district court also correctly held that Defendants were entitled to qualified immunity on Plaintiffs'/Intervenors' failure-to-intervene claim. App.961, R.Doc.89 at 33. The district court declined to decide

whether Plaintiffs/Intervenors adequately pled a constitutional violation because, even assuming they had, such a right was not clearly established outside the excessive-force context. App.961, R.Doc.89 at 33. Because this is not an excessive-force case, this Court should affirm.

Plaintiffs/Intervenors identify no clearly established law holding a supervisor liable for failing to intervene in the context of a subordinate's use of novel technological investigative tools to obtain historical geolocation information without a warrant. *See al-Kidd*, 563 U.S. at 741–42. To the contrary, the Eighth Circuit has expressly recognized that "there is no clearly established law regarding a duty to intervene outside of the excessive force context." *Andrews v. Schafer*, 888 F.3d 981, 984 n.4 (8th Cir. 2018); *see also Hess v. Ables*, 714 F.3d 1048, 1052 (8th Cir. 2013). And the cases Plaintiffs/Intervenors cite all arise in the excessive-force context. *See Nance v. Sammis*, 586 F.3d 604, 609 (8th Cir. 2009); *Zubrod v. Hoch*, 907 F.3d 568, 580 (8th Cir. 2018); *Perkins v. City of Des Moines*, 712 F.Supp.3d 1159, 1181 (S.D. Iowa 2024); *See* Brief of Appellants at 33–34.

Plaintiffs/Intervenors rely on a broad formulation of the doctrine, arguing that it is "clearly established that an officer who is aware of a

constitutional violation and has a realistic opportunity to intervene may be held liable for failing to do so," and that standard is applied regardless of the type of constitutional violation. Brief of Appellants at 33–34.

But that general proposition, stated at a high level of abstraction, fails for qualified immunity purposes, which requires clearly established law defined with a high degree specificity in the particular context at issue. *See al-Kidd*, 563 U.S. at 742. Plaintiffs identify no precedent applying a failure-to-intervene theory to the type of digital-location investigative conduct here, much less placing such liability "beyond debate." *Id.* at 741. Given the absence of clearly established law extending a duty-to-intervene theory to novel geolocation investigations, Defendants are entitled to qualified immunity on this claim as well.

If Plaintiffs/Intervenors contend that the Court should extend the duty-to-intervene doctrine beyond the excessive-force context to cover these circumstances, that argument is properly directed to the en banc court or the Supreme Court. It is not a basis for a panel to disregard controlling circuit precedent or to hold that the law was clearly established when no such authority exists. The district court correctly

held that Defendants were entitled to qualified immunity on all claims asserted by Plaintiffs/Intervenors, and its judgment should be affirmed.

## III. Defendants Are Entitled to Qualified Immunity Because Plaintiffs/Intervenors Failed to Plead a Plausible Constitutional Violation.

This Court need not address the violation prong, because Defendants are entitled to qualified immunity based on the clearly established prong. *See Lombardo*, 38 F.4th at 690. But should it consider only the violation prong instead, it may affirm the judgment on that alternative ground, because Plaintiffs/Intervenors fail to establish any constitutional violation and thus Defendants are entitled to qualified immunity on that ground too. *See Lane v. Peterson*, 899 F.2d 737, 742 (8th Cir. 1990) ("We may affirm a judgment on any ground supported by the record even if not relied upon by the district court.").

### A. Several Plaintiffs/Intervenors lack Fourth Amendment standing to challenge searches of a third-party's gambling account.

Some Plaintiffs/Intervenors admitted they used other individuals' online gambling accounts to place sports wagers in an effort to avoid

detection.[1] Because those accounts belonged to third parties, those Plaintiffs/Intervenors lacked any reasonable expectation of privacy in the accounts or associated account information. They therefore lack standing to challenge Defendants' alleged searches of those accounts or related geolocation information.

Fourth Amendment standing generally "involves two inquiries: first, whether the proponent of a particular legal right has alleged 'injury in fact,' and, second, whether the proponent is asserting his own legal rights and interests rather than basing his claim for relief upon the rights of third parties." *Rakas v. Illinois*, 439 U.S. 128, 139 (1978). "Fourth Amendment rights are personal rights" and "may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969). Thus, a plaintiff challenging a search "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004) (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)).

[1] The individuals lacking standing are Appellants English, Brown, Christensen, Williams, Remsburg, Blom, Ulis, Hanika, Sauser, Lee, Dekkers, Uwazurike, Johnson, Schon, Woodly, Mathis, and Schuster.

The Supreme Court has long recognized that "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas*, 439 U.S. at 134. So "[i]f a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally." *Barragan*, 379 F.3d at 529–530 (quoting *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994)).

Those principles apply equally to digital accounts and electronically stored information. A plaintiff lacks standing to challenge a search of a digital account belonging to another person. *See Davis*, 2022 WL at *7–8 (Gmail account information belonged to another individual, so the defendant failed to show his "own privacy rights [were] at stake").

Plaintiffs/Intervenors failed to plead "a sufficiently close connection" to the accounts Defendants investigated because the accounts belonged to other individuals. *Barragan*, 379 F.3d at 529–30. Indeed, Plaintiffs'/Intervenors' own allegations demonstrate they

intentionally distanced themselves from the accounts to conceal their conduct and to avoid NCAA scrutiny.

A person who disclaims ownership or otherwise disassociates themselves from property, forfeits any reasonable expectation of privacy in that property. *See United States v. Boruff*, 909 F.2d 111, 116–17 (5th Cir. 1990); *United States v. Mangum*, 100 F.3d 164, 170 (D.C. Cir. 1996) (holding a defendant who "denied ownership" of a bag found in trunk of his car "abandoned" any legitimate privacy interest in the bag and lacked standing); *United States v. Green*, 275 F.3d 694, 698–99 (8th Cir. 2001) (finding no standing where a defendant denied any possessory or privacy interest in the property searched). Having intentionally used accounts belonging to others to conceal their identities, Plaintiffs/Intervenors cannot now claim a personal Fourth Amendment privacy interest in those same accounts.

Nor have Plaintiffs/Intervenors plausibly alleged they possessed any lawful ownership, control, or right to exclude others from the third-party accounts sufficient to establish a reasonable expectation of privacy. *See Byrd v. United States*, 584 U.S. 395, 405–07 (2018) (recognizing that a reasonable expectation of privacy generally arises from lawful

ownership, possession or control of property, as well as the corresponding right to exclude). At most, Plaintiffs/Intervenors allege they used accounts owned by others.

But even shared use of property generally diminishes any expectation of privacy. *See United States v. Risse*, 83 F.3d 212, 216 n.3 (8th Cir. 1996) ("[W]here a homeowner allows another person to possess common authority over, or some other significant relationship to, the premises to be searched, the homeowner is held to have a lower expectation of privacy in the searched area."). And here, Plaintiffs/Intervenors were not the account owners, further diminishing their expectation of privacy.

In its standing analysis, the district court misapplied *United States v. Bettis*, 946 F.3d 1024 (8th Cir. 2020), to conclude that Plaintiffs/Intervenors have Fourth Amendment standing. App.941–42, R.Doc.89 at 13–14. Fourth Amendment standing requires a personal, reasonable expectation of privacy in the place or object searched, not merely that the government obtained information relating to a plaintiff. *See Rakas*, 439 U.S. at 133–34; *Barragan*, 379 F.3d at 529. *Bettis* involved a permissive user of a rental vehicle who had a lawful possessory interest

in the vehicle that was searched. *Bettis*, 946 F.3d at 1029 ("An unlicensed driver has more in common with misbehaving guests because the illegal act of unlicensed driving does not interfere with a valid possessory interest.").

Unlike *Bettis*, which involved lawful possession of a third-party's property, this case involves illegal possession of a third-party's property. The district court glossed over that distinction. Plaintiffs/Intervenors neither owned nor lawfully controlled those accounts—the user agreements make clear that individuals cannot use a third-party's sportsbook account to place one's own bets, App.258, R.Doc.42 at 36—and thus possessed no legally cognizable right to exclude others from them. And unlike the unlicensed driving issue in *Bettis*, which did not undermine the renter's lawful possessory interest in the vehicle, Plaintiffs'/Intervenors' alleged use of third-party sportsbook accounts went directly to the legitimacy of their claimed entitlement to access and use those accounts at all. Any purported permission from the account holders here did not create lawful ownership, possession, or control necessary to establish a reasonable expectation of privacy.

*Bettis* thus did not eliminate the requirement that a plaintiff demonstrates a personal privacy interest in the specific place or system searched. Because Plaintiffs/Intervenors cannot establish a reasonable expectation of privacy in the third-party accounts and associated account data, they lack Fourth Amendment standing. This Court may affirm the district court on this alternative ground as to Appellants English, Brown, Christensen, Williams, Remsburg, Blom, Ulis, Hanika, Sauser, Lee, Dekkers, Uwazurike, Johnson, Schon, Woodly, Mathis, and Schuster.

### B. Plaintiffs/Intervenors failed to plead a constitutional violation as to a Fourth Amendment search.

Even where Plaintiffs/Intervenors used their own gambling accounts, they had no reasonable expectation of privacy in their location data because they voluntarily shared that data when signing up to gamble online. Monitoring that data therefore was not an unlawful Fourth Amendment search.

#### 1. Plaintiffs/Intervenors voluntarily and knowingly disclosed their location data to third-party sportsbook operators.

The Fourth Amendment protects only those expectations of privacy "that society is prepared to recognize as 'reasonable.'" *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). Under the

longstanding third-party doctrine, "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith*, 442 U.S. at743–44; *see also Miller*, 425 U.S. at 442–43.

That principle applies here. To place wagers through online sportsbook applications, Plaintiffs/Intervenors necessarily enabled geolocation services and transmitted their location information to the sportsbook operators and GeoComply for eligibility verification and regulatory compliance purposes. App.344, R.Doc.42 at 122; App.347, R.Doc.42 at 125; App.457–59, R.Doc.42 at 235–37; App.615, R.Doc.43-2 at 6, App.618, R.Doc.43-2 at 9; App.620–22, R.Doc.43-2 at 11–13; App.646, R.Doc.43-2 at 37; App.648, R.Doc.43-2 at 49; App.731, R.Doc.43-2 at 122; App.734, R.Doc.43-2 at 125.

The applications' terms and privacy disclosures expressly informed users that location data would be collected, analyzed, and shared in connection with operation of the wagering platforms and compliance with gaming regulations—including sharing that data with law enforcement. App.228, R.Doc.42 at 6; App.231, R.Doc.42 at 9; App.233–35, R.Doc.42 at 11–13; App.259, R.Doc.42 at 37; App.271, R.Doc.42 at 49; App.615, R.Doc.43-2 at 6; App.618, R.Doc.43-2 at 9; App.620–22, R.Doc.43-2 at 11–

13; App.646, R.Doc.43-2 at 37; App.648, R.Doc.43-2 at 49; App.731, R.Doc.43-2 at 122; App.734, R.Doc.43-2 at 125; App.739, R.Doc.43-2 at 130. Plaintiffs/Intervenors therefore knowingly and repeatedly conveyed the very information they now claim was unlawfully searched.

Nor was the information disclosure incidental or unavoidable. Plaintiffs/Intervenors were not compelled to transmit their location information merely to participate in ordinary modern life. *See Carpenter*, 585 U.S. at 313–315; *United States v. Davis*, 785 F.3d 498, 527 (11th Cir. 2015) (Rosenbaum, J., concurring) ("[I]n our modern world, we must now expose to a third party information that we would have previously kept private, in order to continue to participate fully in society.").

Rather, they affirmatively accepted the sportsbook applications' terms and chose to engage in online sports gambling—an elective, heavily regulated commercial activity that could lawfully occur only in approved jurisdictions and only after geolocation verification confirmed the user's eligibility to place wagers. Each time Plaintiffs/Intervenors logged into the applications or attempted to place a wager, they voluntarily triggered the location-verification process necessary to complete the transaction.

The district court erred in characterizing the data generation here as "automatic[]" and therefore not voluntary. App.948, R.Doc.89 at 20. Even if the applications transmitted geolocation coordinates automatically after users opened the sportsbook apps, Plaintiffs/Intervenors still knowingly enabled location permissions, accepted their governing terms and repeatedly used the applications with full awareness that geolocation verification was required. The relevant question under *Smith* and *Miller* is whether Plaintiffs/Intervenors knowingly and voluntarily exposed the information to third parties, not whether every individual data point required a separate manual transmission. *See Smith*, 442 U.S. at 744–45.

Courts have repeatedly held that users lack a reasonable expectation of privacy in information knowingly and voluntarily shared with private companies in the ordinary course of using digital services. *See Smith*, 442 U.S. at 743–44; *Miller*, 425 U.S. at 442–44. Like the bank records in *Miller* and the dialed telephone numbers in *Smith*, the geolocation information here was voluntarily disclosed to third-party companies as part of a voluntary commercial transaction and for a business purpose integral to the services provided. Plaintiffs/Intervenors

cannot plausibly claim surprise that location-verification data generated to facilitate lawful online gambling and regulatory compliance could later be reviewed by law enforcement and others examining suspicious wagering activity.

### 2. *Carpenter* does not clearly establish a reasonable expectation of privacy in the limited GeoComply data at issue.

*Carpenter* does not aid Plaintiffs/Intervenors because that decision recognized only a "narrow" exception to the traditional third-party doctrine. 585 U.S. at 316. *Carpenter* addressed the government's acquisition of extensive historical CSLI automatically generated by a person's use of a cell phone over a prolonged period. *Id.* at 301–03. The Supreme Court emphasized that CSLI provided the government with an "all-encompassing record" of a person's movements and enabled "near perfect surveillance" extending deeply into the "privacies of life." *Id.* at 311–12.

The GeoComply data here bears little resemblance to the comprehensive, automatic tracking at issue in *Carpenter*. The challenged information here consisted of discrete location checks generated only when users voluntarily and affirmatively accessed sportsbook

applications or attempted to place wagers. The data shared with law enforcement was tied to specific suspicious gambling transactions and was collected for eligibility verification and gaming regulatory compliance, not continuous background monitoring of users' movements throughout daily life. Unlike the CSLI in *Carpenter*, the information did not chronicle Plaintiffs'/Intervenors' every movement, reveal an exhaustive timeline of their whereabouts, or provide the government with the type of pervasive retrospective surveillance simply because they used a cell phone.

Equally important, users affirmatively chose to transmit the information each time they logged into the gambling applications or initiated wagering activity. The data therefore was not "inescapable" in the sense described in *Carpenter*, where the Court stressed that carrying a cell phone is effectively indispensable to participation in modern society. *Id.* at 311, 320. Online sports wagering is voluntary, and geolocation verification is an express and known prerequisite to participation. Plaintiffs/Intervenors voluntarily disclosed their location information to gain access to the very services they sought to use.

Courts applying *Carpenter* have repeatedly declined to extend its reasoning beyond the unique context of prolonged historical CSLI surveillance. In *Sanchez v. Los Angeles Department of Transportation*, the Ninth Circuit held that users lacked a reasonable expectation of privacy in location data voluntarily shared through e-scooter applications. 39 F.4th 548, 558–61 (9th Cir. 2022). The court emphasized that, unlike CSLI passively generated by cell phones, the data was disclosed only when users affirmatively chose to use the application and engage in a commercial transaction. *Id.* at 559. The same is true here. Plaintiffs affirmatively transmitted location data each time they accessed sportsbook applications to place wagers.

*Sanchez* also distinguished *Carpenter* because the disclosed data did not permit the type of "pervasive" long-term surveillance that concerned the Supreme Court and because the service at issue, like online sports wagering here, was not "indispensable to participation in modern society." *Id.* at 558–60. Those distinctions independently foreclose any attempt to extend *Carpenter* to routine sportsbook geolocation-verification data. At minimum, *Carpenter* does not clearly extend to the limited commercial geolocation data at issue here.

### 3. Plaintiffs/Intervenors failed to plausibly allege a reasonable expectation of privacy under traditional Fourth Amendment principles.

Outside the narrow CSLI context addressed in *Carpenter*, ordinary third-party doctrine principles continue to govern digital business records and voluntarily disclosed information. *See Smith*, 442 U.S. at 743–44; *Miller*, 425 U.S. at 442–43. Plaintiffs/Intervenors voluntarily exposed their location information to private companies to obtain access to online gambling services and assumed the risk those companies could disclose the information for regulatory or law-enforcement purposes.

This case also does not resemble the physical trespass and prolonged GPS tracking discussed in *United States v. Jones*, 565 U.S. 400 (2012). Defendants did not physically intrude on Plaintiffs'/Intervenors' property, install tracking devices, or secretly monitor Plaintiffs'/Intervenors' movements over time. *See id.* at 403. Instead, Defendants reviewed limited account-related location information already possessed by private companies as part of routine commercial operations and statutory regulations.

Other courts continue to apply the traditional third-party doctrine to voluntarily disclosed digital business records after *Carpenter*. *See, e.g.*,

*United States v. Gratkowski*, 964 F.3d 307, 311–13 (5th Cir. 2020) (Bitcoin transaction record); *Harper v. Werfel*, 118 F.4th 100, 107–12 (1st Cir. 2024) (cryptocurrency exchange records); *cf. United States v. Shipton*, 5 F.4th 933, 936 (8th Cir. 2021) (IP-address and peer-to-peer-network information). Those decisions confirm that *Carpenter* did not disturb the ordinary rule that individuals lack a reasonable expectation of privacy in information voluntarily conveyed to third parties in the ordinary course of using digital services.

And online sports wagering occurs within a heavily regulated industry that requires geolocation verification and compliance monitoring by design, further diminishing any objectively reasonable expectation of privacy in the limited transaction location data at issue here. If Plaintiffs'/Intervenors' theory prevails, it would contort the Fourth Amendment beyond existing precedent by transforming ordinary commercial compliance data into constitutionally protected information whenever it incidentally reflects a user's location. Neither the Supreme Court nor the Eighth Circuit has recognized such a rule.

Because Plaintiffs/Intervenors voluntarily disclosed the challenged location information to third-party sportsbook operators and GeoComply,

and because the limited data at issue falls outside the narrow rule announced in *Carpenter*, Plaintiffs/Intervenors failed to plausibly allege an unlawful Fourth Amendment search. The district court's dismissal should therefore be affirmed.

### C. No unconstitutional seizure or derivative Fourth Amendment violation occurred.

No unlawful seizure occurred either. As the district court correctly concluded, Defendants did not "seize" Plaintiffs'/Intervenors' location data. App.959–60, R.Doc.89 at 31–32. And Plaintiffs'/Intervenors' cell phones were seized only pursuant to valid warrants supported by probable cause. App.957–59, R.Doc.89 at 29–31. On appeal, Plaintiffs/Intervenors do not specify if they are appealing both the argued seizure of their cell phones or location data and instead just claim that their "property" was seized. *See* Appellants Brief at 32.

1. Plaintiffs/Intervenors "tainted information" theory fails because it depends entirely on the premise that Defendants conducted an unconstitutional search when reviewing GeoComply data. *See* Brief of Appellants at 31–32. But no unconstitutional search occurred. Plaintiffs/Intervenors voluntarily disclosed their geolocation location information to sportsbook operators and GeoComply as a condition of

participating in online sports wagering. Defendants merely reviewed data lawfully maintained by those third parties. Because there was no antecedent Fourth Amendment violation, the derivative "taint" theory fails as a matter of law.

Nor does *Madrid* assist Plaintiffs/Intervenors. *See* Brief of Appellants at 31–32. *Madrid* applies the exclusionary rule in criminal cases where unlawfully obtained evidence allegedly contributes to probable cause. 152 F.3d at 1038–40. Here, Plaintiffs/Intervenors identify no unconstitutional predicate search. Absent such a violation, there is no poisonous tree and therefore no fruit to suppress.

Further, suppression is not warranted where officers act in objectively reasonable reliance on a warrant issued by a neutral magistrate. *See United States v. Saddler*, 19 F.4th 1035, 1040 (8th Cir. 2021). The exclusionary rule is a "judicially created remedy" designed to deter deliberate or reckless constitutional violations, not to penalize objectively reasonable conduct. *United States v. Leon*, 468 U.S. 897, 907–09 (1984). So the Supreme Court has made clear that evidence should not be excluded when it is "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *Id.* at 922. That principle

controls here. Defendants acted in objectively reasonable reliance on the warrants at issue here, and Plaintiffs/Intervenors make no showing to the contrary. Nor do they identify any warrant that was later invalidated. *See id.* Accordingly, any suppression argument is foreclosed.

2. The alleged location data monitoring did not constitute an unlawful Fourth Amendment seizure. App.959–60, R.Doc.89 at 31–32. The Fourth Amendment distinguishes between searches, which implicate privacy interests, and seizures, which interfere with possessory interests. *See PPS, Inc. v. Faulkner Cnty., Ark.*, 630 F.3d 1098, 1102 (8th Cir. 2011). The Supreme Court has likewise emphasized that a "seizure threatens" an individual's "interest in retaining possession of property," whereas "a search" implicates privacy interests. *Texas v. Brown*, 460 U.S. 730, 747–48 (1983) (Stevens, J., concurring); *see also United States v. Clutter*, 674 F.3d 980, 984 (8th Cir. 2012). A seizure occurs only "when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

No interference occurred. Defendants reviewed location data already possessed by third-party sportsbook operators and GeoComply.

The district court correctly concluded that "Plaintiffs and Intervenors do not allege how they were deprived of their ability to access or use that [location] information," and so "Defendants did not meaningfully interfere with Plaintiffs' and Intervenors' possessory interests." App. 960, R.Doc.89 at 32. Here, the geolocation data remained available to Plaintiffs/Intervenors at all relevant times. Mere review of existing data is not a seizure. *Cf. Arizona v. Hicks*, 480 U.S. 321, 324 (1987).

In any event, assuming some seizure occurred, it was reasonable. *PPS, Inc.*, 630 F.3d at 1103 ("[T]he Fourth Amendment does not prohibit all unwarranted seizures, only unreasonable ones."). Plaintiffs/Intervenors consented to geolocation monitoring as a condition of using the sportsbook application, which authorized collection and disclosure of location data to third parties, including law enforcement. The legal and contractual context of online betting gave officers "a prior justification" for being in the digital space in which Plaintiffs/Intervenors shared their data and placed them "lawfully in a position from which [to] view the [data]." *Id.* (quoting *United States v. Muhammad*, 604 F.3d 1022, 1027 (8th Cir. 2010)).

3. There was no unlawful seizure of Plaintiffs'/Intervenors' cell phones because the search warrants used to seize them were valid. App.957, R.Doc.89 at 29. A warrant is valid when issued by a neutral magistrate, supported by probable cause, and sufficiently particularized. *Dalia v. United States*, 441 U.S. 238, 255–56 (1979). Plaintiffs/Intervenors do not challenge any of those requirements. Instead, they argue only that the warrants were "tainted" by an allegedly unlawful investigation. *See* Brief of Appellants at 31. Because the underlying conduct was lawful, that derivative challenge fails.

A warrant is deficient if the "affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement" and the false statement was essential to establishing probable cause. *United States v. Stevens*, 530 F.3d 714, 718 (8th Cir. 2008); *see also Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)).

Plaintiffs/Intervenors identify no such false statement. Their only complaint is that the affidavit described the investigative steps undertaken as "in the normal course of duties" and referenced suspicious wagering activity. Brief of Appellants 32. But Plaintiffs/Intervenors do

not allege that any factual representation was false, fabricated, or misleading.

And to show reckless disregard for the truth, Plaintiffs/Intervenors would need to show that Defendants "entertained serious doubts" about the truth of the statements in an affidavit. *Davis v. City of Little Rock*, 122 F.4th 326, 330 (8th Cir. 2024). Plaintiffs/Intervenors dispute the legality of the underlying investigation: that is not a *Franks* violation. *Franks*, 438 U.S. at 165 (concerned with deliberate or factual falsehoods).

Investigators were not required to include Plaintiffs/Intervenors preferred legal characterization of the investigation as "illegal" in the affidavit. The affidavit's description of investigative steps was, at minimum, a reasonable characterization of routine law enforcement activity. As the district court correctly explained, a reasonable investigator could believe those steps fell within the normal scope of duties. *See* App.959, R.Doc.89 at 31. A disagreement over legal theory does not establish that officers "entertained serious doubts" about the truth of the affidavit. *Davis*, 122 F.4th at 330.

4. Plaintiffs/Intervenors lump together the issues of illegal subpoenas and illegal warrants in their briefing. *See* Brief of Appellants

at 30–32. But valid subpoenas and valid warrants have two separate standards. *Compare United States v. Whispering Oaks Residential Care Facility*, *LLC*, 673 F.3d 813, 817 (8th Cir. 2012), *with Dalia,* 441 U.S. at 255–56. And Plaintiffs/Intervenors make one conclusory statement that "Defendants did not have a lawfully authorized purpose for issuing the subpoenas because they were not engaged in a bona fide criminal investigation." Brief of Appellants at 32. Plaintiffs/Intervenors do not develop argument as to the subpoena issue other than that sentence, so the issue is forfeited. *See Roberts*, 881 F.3d at 1053; Fed. R. App. P. 28(a)(8)(A).

Regardless, "[c]ourts rarely, if ever, quash a subpoena on the grounds that it was issued for an unlawful purpose," so long as they are issued in the course of a "bona fide criminal investigation." *Wendt v. Iowa*, 2019 WL 13241967, at *10–11 (S.D. Iowa Sept. 23, 2019), *aff'd*, 971 F.3d 816 (8th Cir. 2020). A challenger to the subpoena "bears a heavy burden" to show the subpoena lacked a valid investigative purpose. *Whispering Oaks*, 673 F.3d at 817. Here, the subpoenas were issued as part of an ongoing investigation into potential match fixing and related cheating

activity, reviewed and approved by prosecuting attorneys, and therefore fall well within a lawful investigative purpose.

Because no unconstitutional search occurred, no seizure occurred, and Plaintiffs/Intervenors fail to establish any defect in the warrants or any *Franks* violation, the district court's dismissal should be affirmed.

## CONCLUSION

For these reasons, this Court should affirm the district court's dismissal of the complaints.

June 1, 2026

Respectfully submitted,

BRENNA BIRD
Attorney General of Iowa

ERIC WESSAN
*Solicitor General*

PATRICK C. VALENCIA
*Deputy Solicitor General*

*/s/ Halle B. Kissell*
HALLE B. KISSELL
*Assistant Solicitor General*

Hoover State Office Building
1305 East Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
(515) 281-4209 (fax)
halle.kissell@ag.iowa.gov

*Counsel for Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Local R. 25A, I certify the following:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,978 words, excluding those parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because the brief has been prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft Office 365.

3. This brief complies with the electronic filing requirements of Local R. 25A because the text of the electronic brief is identical to the text of the paper copies and because the electronic version of this brief has been scanned for viruses and no viruses were detected.

June 1, 2026

*/s/ Halle B. Kissell*
HALLE B. KISSELL
*Assistant Solicitor General*

*Counsel for Defendants-Appellees*

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on June 1, 2026. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

June 1, 2026

*/s/ Halle B. Kissell*
HALLE B. KISSELL
*Assistant Solicitor General*

*Counsel for Defendants-Appellees*